# Brown & Co. *v.* Seay.

*Bill in Equity for Injunction, by State Printers, against
Governor, Commissioner of Agriculture, and other State
Officers.*

1.   *Public printing; constitutional provision.*—The constitutional pro-
vision which declares that all printing and binding for the several de-
partments of the government "shall be performed under contract, to
be given to the lowest responsible bidder below a maximum price, and
under such regulations as shall be prescribed by law" (Art. IV, § 30),
is not legislative in its nature, nor is it self-executing, but contemplates
and requires legislation to carry it into effect.

[Brown & Co. v. Seay.]

2. *Printing for Agricultural Department.*—By the statutes establishing and regulating the Department of Agriculture (Sess. Acts 1882-83, p. 190; 1884-85, p. 168), all the moneys arising from its operations, though paid into the treasury, are required to be kept separate and apart, and used for its exclusive use and benefit, under rules to be prescribed by the Governor; and the commissioner is required to prepare and publish a hand-book, descriptive and statistical, specially designed to invite the attention of immigrants; but the provisions regulating these matters are inconsistent with the statutory provisions then regulating the public printing (Code, 1876, §§ 111-39), and the printing of said hand-book is not within the terms of the contract of the public printers made under the former statutes.

APPEAL from the City Court of Montgomery, in equity.

Heard before the Hon. THOS. M. ARRINGTON.

The bill in this case was filed on the 8th August, 1888, by W. D. Brown & Co., partners in business having the contract with the State for the public printing during the years 1887-8, against his Excellency Governor Seay, Hon. R. F. Kolb, Commissioner of Agriculture, and other State officers; and sought to prevent, by injunction, the payment of any money out of the State treasury for the printing and binding of a hand-book prepared by Mr. Kolb, and which he had had printed by contract in Atlanta, Georgia; the complainants insisting and claiming that the work was within the terms of their contract with the State. The court dismissed the bill, on motion, for want of equity, and its judgment and decree is here assigned as error.

WATTS & SON, for appellants.

THOS. N. MCCLELLAN, Attorney-General, *contra.*

CLOPTON, J.—Appellants seeks by the bill to enjoin the Commissioner of Agriculture from contracting with, or paying any person or persons, other than complainants, for printing any books, documents, circulars, notices, blanks or other matter for the Department of Agriculture, and also to enjoin the Governor, Auditor and Treasurer, respectively, from approving any account, drawing any warrant, and paying any warrant drawn, in favor of any person or persons, other than complainants, for printing any hand-books ordered by the Commissioner of Agriculture. The bill alleges that complainants, in December, 1886, made a contract with the Secretary of State to do the public printing and binding for a period of two years from January 1, 1887, in accordance with the statute requiring the public printing and binding to

be let out to the lowest responsible bidder. It further alleges, that in July, 1888, the Commissioner of Agriculture contracted with some persons unknown to print the hand-book of Alabama, at the "Job Printing Office of the Atlanta Constitution," in Atlanta, Georgia, without advertising for bids therefor, and that such printing is covered by the contract of complainants. The hand-book, the publication of which is complained of, is provided for by section 13 of the act amending the act to establish the Department of Agriculture, which requires the commissioner, "as soon as practicable, to prepare a convenient hand-book, with necessary illustrative maps, which shall contain all necessary information as to the mines, minerals, forests, soils and other products, climate, water and water power, fisheries, mountains, streams, industries, and such statistics as are best adapted to give proper information of the attractions and advantages which the State affords to immigrants, and shall make illustrative exposition thereof, whenever practicable, at international or State Expositions."—Acts, 1884–5, p. 168. On motion of defendants, the City Court dismissed the bill for want of equity; and from this decree the appeal is taken.

Section 30 of Article IV of the Constitution declares: "All stationery, printing, paper and fuel, used in the legislative or other departments of government, shall be furnished, and the printing, binding and distribution of laws, journals, department reports, and all other printing and binding, and repairing and furnishing the halls and rooms used for the meeting of the General Assembly and its committees, shall be performed under contract to be given to the lowest responsible bidder below a maximum price, and under such regulations as shall be prescribed by law." It is contended, that this provision is imperative upon the people, the officers and agents of the State, and is beyond the power of the Governor or other officer to disregard. The purpose of the provision is, to change the mode of having the public printing done—from being performed by a State printer elected by the General Assembly, which was the mode at the time the Constitution was ordained, to performance under contract. The provision is not legislative in its nature, nor is it a negative or prohibitory clause, which of itself declares the law. It establishes a principle, but does not provide the means requisite to carry it into effect. Doubtlessly, it was the intention to impose a duty on the General Assembly, and to require the enactment of legislation on the particular

subject of the public printing. The requirement, however, has only moral force, no rule for the enforcement of the duty being provided. The provision in terms contemplates and provides for supplemental legislation—"shall be performed under contract, and under such regulations as may be prescribed by law." Not doing any thing which it declares shall be done, it is not self-executing, but expends its whole force in commanding legislative action. Being merely mandatory, it is inoperative until aided by legislation, and is operative only to the extent the supplemental legislation imparts vitality.—Cooley on Const. Lim. 98.

In obedience to the constitutional mandate, and for the purpose of carrying into effect the principle declared thereby, as to the mode of having the public printing done, the legislature enacted, March 7, 1876, soon after the Constitution went into effect, "An act to provide for the public printing of the State," which constitutes sections 111 to 117, inclusive, of Code of 1876. Section 111 declares: "It shall be the duty of the Secretary of State to let out to the lowest responsible bidder, during the month of December, 1876, and during such month every two years thereafter, all the public printing and binding authorized by law for the State, for a period of two years, commencing on the first day of January thereafter." The terms of the section may be broad enough to include all the public printing and binding authorized by law, but the comprehensiveness of the language is limited and qualified by the provisions of the succeeding section 112. The latter section provides: "Any person, company or firm, citizens of this State, who shall desire to do such printing, shall file with the Secretary of State a sealed proposal, setting forth the price at which he or they will execute the public printing and binding. No bid shall be received and considered at a greater rate than that fixed in an act for the compensation of the State printer, and bids shall be at that rate, or a certain per-cent. below it." The act, to which the section refers in terms, is the act of December 9th, 1874, "to fix the compensation of the State printer," and is referred to as furnishing a maximum rate at which bids shall be received and considered. The statute in force at the time the act of March 7, 1876, was enacted, provided: "The State printer must do all the State printing which is, or may be hereafter required by law, at such prices, and upon such terms and conditions, as may from time to time be established by law.—Rev. Code, § 128. The act of Decem-

ber 9th, 1874, fixed the rates of compensation of the State printer for doing the public printing required by law, and in so doing, by necessary implication, defined and classified the kinds of public printing and binding required to be done by the State printer, as follows: The acts and joint resolutions of the General Assembly, and binding the requisite number; the journals and revenue laws; blanks on paper and parchment; the printing done for each house of the General Assembly, while in session, or other printing; figure and rule, and figure work; press-work, and broad-sides, including paper; and folding and stitching reports, bills and other documents.—Acts, 1874–5, 156. Section 130 of Revised Code of 1867 provides the evidence upon which, and the manner in which payment for the public printing shall be made—for all printing done by order of either house of the General Assembly, or for the executive or State officers, upon presentation of a copy of the order certified by the Secretary of the Senate, the Clerk of the House, or by the officer ordering the work, and the production of a copy of the work, the comptroller must issue his warrant for the payment of the same, according to the prices prescribed by law. It is manifest from these statutory provisions and regulations, that the State printer was not required to do any public printing or binding for which no rate of compensation was fixed by law. Section 135 of Code of 1876 requires the presentation of a copy of the order, certified in the same manner, and the production of a copy of the work, as provided by section 130 of the Revised Code, and only changes it in requiring that the auditor "must issue his warrant for the payment of the same, according to the price specified in the contract."

Reading the supplemental legislation in the light of the constitutional provision, that the public printing and binding "shall be performed under contract to be given to the lowest responsible bidder below a maximum price, and under such regulations as shall be prescribed by law", and construing the statutes in connection with the act which fixed the rates of compensation of the State printer, and which provided on what evidence, and the manner in which payment therefor should be made, both of which are incorporated as parts of the subsequent legislation, it seems clearly to follow, that the public printing and binding, provided by section 111 of Code of 1876, shall be let out to the lowest responsible bidder, was intended to be of the same character and kinds of

printing and binding, which the State printer was required by law to perform, and for which rates of compensation were established. No maximum rates are fixed for any other kind, and no other means afforded to ascertain the prices, according to which payment shall be made under the contract. On this construction of the statutes, the proposal and contract of complainants appears to have been made; the proposal being to do all the public printing authorized by law, at a certain per-cent. less than the maximum price, and including binding only of the Acts, Senate and House Journals, and the manuscript records of the Supreme Court. With the exception of the latter, the contract covers only the printing and binding, for which rates of compensation were prescribed by the act of December 9, 1874, which were adopted as the maximum prices at or under which proposals should be made.

In reference to the public printing to be performed by the contractor, section 115 of the Code of 1876 provides: "All of the public printing and binding authorized by law shall be given to such person, company or firm, by the officer *now* authorized, to be executed in the manner *now* required by law; and he shall receive his compensation therefor under the contract on the same evidence, and in the same manner as is now prescribed by law." The Department of Agriculture was first established in 1883. By the amendatory act of February 17, 1885, all money arising from its operations, as authorized and regulated by the statute, is required to be paid into the State treasury, and kept on a separate account, as a fund for the exclusive use and benefit of the department; and all sums necessary to support the department are to be paid out of this separate fund, under such rules as may be prescribed by the Governor.—Acts 1884-5, 168. The Department of Agriculture having been created since the enactment of section 115, there is no officer who was at that time authorized by law to give the printing and binding to the contractor; and the rules as to the evidence and manner of payment are so variant from those then prescribed by law, that the printing and binding ordered by the department can not be regarded as constituting any part of the printing and binding required by that section to be given to the contractor, to whom it was awarded under sections 111 and 112.

That the legislative construction of the constitutional provision, and of the sections of the Code of 1876 enacted for the purpose of carrying it into effect, is in accord with these

views, is shown by several acts passed by the General Assembly during the continuance of the contract of complainants. As illustrations, allusion may be made to the act which authorizes the Governor, Secretary of State, and the State Geologist, to determine what number of the latter's reports, volumes or bulletins, shall be published, and which the Governor is required to have printed and bound with illustrated charts, maps, drawings and sketches, at such times, places and in such manner and style, as such officers may deem best; the act making it the duty of the Secretary of State to contract for the publication of Riley's book, entitled *"Alabama as it is, or the Immigrants or Capitalists' Guide Book to Alabama;"* and the act for the publication and distribution of the Code of 1886, which requires the Governor to advertise for bids and award the contract to the lowest responsible bidder.—Acts 1886—7, 52, 79, 43. And, also, as illustrative of the legislative construction, reference may be made to section 598 of Code 1876, which authorized the Judges of the Supreme Court to contract for the publication of the Reports, and to transfer the proprietorship of each volume to any suitable person who will publish the same free of charge to the State, which continued in force until the Code of 1886 went into effect.

It may be that the language of the Constitution is sufficiently comprehensive to include all the printing and binding authorized by law for the State; but, if such be conceded, the supplemental legislation has not provided any regulations, under which the publication of the hand-book, which the commissioner is directed to prepare by the act of February 17, 1885, may be performed under contract to be let out to the lowest responsible bidder; nor is the publication of such book covered by the contract of complainants. It results, that the contract for its publication, as alleged in the bill, is not in violation of any operative provision of the Constitution, or of the statutes regulating the public printing, or in disregard of the contract of complainants.

We have considered the questions presented in respect to the legislation, supplementing the constitutional provision, as embodied in the Code of 1876, by which the case is governed. It will be observed, that the Code of 1886 makes material changes in several respects.—Code of 1886, §§ 199-231. In order not to be misunderstood, or to mislead, we should remark, that the views and opinions herein expressed are not intended to be considered applicable to the construc-

[Louisville & Nashville R. R. Co. v. Coulton.]

tion and operation of the supplemental legislation provided by the adoption of the Code of 1886.

A consideration of other questions is not required.

Affirmed.